Filed 8/24/16  Tehachapi First v. City of Tehachapi CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TEHACHAPI FIRST,<br><br>   Plaintiff and Appellant,<br><br>   v.<br><br>CITY OF TEHACHAPI,<br><br>   Defendant and Respondent;<br><br>WAL-MART STORES, INC.,<br><br>   Real Party in Interest. | F072149<br><br>(Super. Ct. No. S-1500-CV-273965)<br><br>**OPINION** |

        APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

        M.R. Wolfe & Associates and Mark R. Wolfe for Plaintiff and Appellant.

        Lebeau Thelen and Patrick Charles Carrick for Defendant and Respondent.

        Manatt, Phelps & Phillips and Keli N. Osaki for Real Party in Interest.

-ooOoo-

        This appeal involves an environmental impact report (EIR) prepared for the proposed construction of a Wal-Mart Supercenter in Tehachapi, California.  Plaintiff contends that the revised EIR's treatment of cumulative noise impacts violated the

California Environmental Quality Act (CEQA)[1] on three separate grounds. These violations are the basis for plaintiff's contention that the trial court should not have discharged its writ of mandate directing the City of Tehachapi (City) to address inadequacies in the initial EIR's analysis of cumulative impacts.

Plaintiff's first claim of error relates to the location on residential lots where measurements were taken to establish the baseline noise level. Plaintiff contends the measurements should have been taken at the property line rather than next to the lot's buildings. We reject this contention because plaintiff has not shown that a general or specific rule of law dictates where such measurements should be taken. Thus, we conclude that the identification of the proper location presented a question of fact committed to the discretion of City in its role as the lead agency.

Plaintiff's second claim of error relates to the revised EIR's decision to evaluate roadway segments containing hotels by using the noise thresholds applicable to commercial property, rather than residential property. Plaintiff contends that the revised draft EIR determined that hotels were, in fact, a noise-sensitive land use because it stated that a hotel *may* be considered a noise-sensitive use. In our view, that statement was not a determination, acknowledgement or finding that the hotels in question were noise-sensitive uses. Consequently, plaintiff has not established the foundation for its argument that the roadway segments should have been subject to the noise standards used for residential property.

Plaintiff's third claim of error relates to the standards or thresholds used to determine whether cumulative noise impacts were significant and whether the project's incremental contributions to significant cumulative noise impacts were "'cumulatively

---

[1] Public Resources Code section 21000 et seq. All unlabeled statutory references are to the Public Resources Code.

2.

considerable'" for purposes of CEQA. (§ 21083, subd. (b); Guidelines,[2] §§ 15130 & 15355.) This claim of error fails because, among other things, plaintiff has not demonstrated that the same standards were used for the two inquiries.

We therefore affirm the order discharging the writ of mandate.

## FACTS

### *The Parties*

Plaintiff Tehachapi First is an unincorporated organization that alleges its members are residents, citizens, taxpayers and property owners in Tehachapi and the Tehachapi area. Plaintiff's members include Shannon Turner, Rory Turner, Christopher Zehnder, Susan Robins, and Sara Klingenberg.

Defendant City is organized under the general law of California and is located in Kern County. It is a "general law city" as that term is defined in Government Code section 34102 and is the lead agency responsible under CEQA for reviewing the environmental effects of the proposed project.

Real party in interest Wal-Mart Stores, Inc. is a Delaware corporation with its principal place of business in Bentonville, Arkansas (Wal-Mart). Wal-Mart is the owner and proponent of the project. Early in the litigation, the parties stipulated that Wal-Mart was the "recipient of an approval" for purposes of CEQA and agreed to the dismissal of the developer, Greenberg Farrow Architecture Incorporated.

### *The Project*

Wal-Mart owns 25 acres of undeveloped land south of Tehachapi Boulevard and east of, and adjacent to, Tucker Road (State Route 202). The land is designated for community commercial use by City's general plan and is zoned "C-3," general commercial use, under City's zoning ordinance. Antelope Run, a natural drainage feature

---

[2]    "Guidelines" refers to the regulations promulgated to implement CEQA and set forth in California Code of Regulations, title 14, section 15000 et seq. (§ 21083.)

on the eastern boundary of Wal-Mart's land, runs north-south and is a tributary of Tehachapi Creek.

In July 2007, Wal-Mart applied to City for approval of the construction of a 165,000 square foot Wal-Mart Supercenter and the development of three outlots. The outlots do not have identified uses, but are likely to become retail space and fast food restaurants. The Supercenter, with its appurtenant structures and facilities, would offer groceries and general retail merchandise 24 hours per day. The Supercenter would include a garden center with an exterior customer pick-up facility and a pharmacy with a drive-through. It also might include food service, a photo studio, a banking center, and a vision and hearing care center.

Wal-Mart also proposed dedicating 1.45 acres of the site to City. That land is on east side of the site and would be used for parking and would provide access to trails and a proposed bike path along Antelope Run.

*Environmental Review*

In September 2007, City issued a notice of preparation of an EIR for the project. Subsequently, City circulated a draft EIR and obtained comments from other agencies and the public. In December 2010, City released a final EIR that included responses to the public and agency comments.

On May 19, 2011, the city council held a public hearing on an appeal from City's planning commission's certification of the EIR and approval of the project. After receiving input from the public, the city council voted to deny the appeal, certified the final EIR, adopted a statement of overriding considerations with findings, and approved the project.

The next day, City filed a notice of determination, thereby starting a 30-day statute of limitations for any CEQA action or proceeding. (§ 21167, subd. (e); Guidelines, § 15094, subd. (g); see § 21152 [notice of determination filed by local agency].)

4.

## PROCEEDINGS

In June 2011, plaintiff filed a verified petition for writ of mandate challenging City's certification of the EIR and its approval of the project. Plaintiff alleged City violated many CEQA provisions and the project was inconsistent with City's general plan and zoning ordinances.

In June 2012, the trial court determined the EIR for the Wal-Mart Supercenter on Tucker Road was inadequate and issued a peremptory writ of mandate directing City to (1) set aside its certification of the EIR and approval of the project and (2) take action to ensure the EIR's treatment of cumulative water supply impacts, cumulative off-site traffic noise, and cumulative traffic impacts complied with CEQA.

In September 2012, City filed an initial return to the peremptory writ stating (1) it was preparing a supplemental EIR to address the issues identified by the court and (2) its work on the draft supplemental EIR was at an early stage.

In June 2013, a revised draft EIR was made available to the public for comment. In November 2013, written responses to the comments were prepared and a revised final EIR was completed. In December 2013, City's planning commission held a public hearing on the revised final EIR. Near the end of that public hearing, the planning commission passed a resolution certifying the EIR.

Plaintiff appealed the planning commission's decision to the city council. On January 27, 2014, the city council held a special meeting and received oral testimony relating to the revised final EIR. Before the close of that meeting, the city council denied the appeal, certified the revised final EIR, and reapproved the project.

In October 2014, City filed a motion to discharge the writ, which Wal-Mart joined. City and Wal-Mart contended (1) the revised analysis of cumulative impacts to the water supply was supported by substantial evidence, (2) the findings relating to cumulative traffic impacts were supported by substantial evidence, (3) the revised analysis of off-site

traffic noise was legally proper, and (4) the findings that noise impacts were less than significant were supported by substantial evidence. Plaintiff opposed the motion.

In April 2015, the trial court held a hearing on the motion. On May 5, 2015, the trial court issued an order granting the motion to discharge the peremptory writ of mandate. After notice of entry of the order was served, plaintiff filed a notice of appeal from the order granting City's motion to discharge the writ.

**DISCUSSION**

I.      CEQA PRINCIPLES

    A.      Standard of Review

Appellate review in this CEQA proceeding is governed by the abuse of discretion standard set forth in section 21168.5. Consequently, our "inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.)

Under this abuse of discretion standard, we independently review claims that a public agency committed legal error (i.e., did not proceed in the manner required by law) in conducting the environmental review required by CEQA. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427 (*Vineyard Area Citizens*).) By comparison, we review claims that an agency committed factual errors under the substantial evidence standard. (*Id*. at p. 426.)

    B.      Noise

        *1.      CEQA and the Guidelines*

The Legislature has specifically declared that it is the policy of California to "[t]ake all action necessary to provide the people of this state with … freedom from excessive noise." (§ 21001, subd. (b).) Consequently, CEQA lists noise as one of the physical conditions that constitute part of the "[e]nvironment." (§ 21060.5; see

6.

Guidelines, § 15360 ["[e]nvironment" includes "ambient noise"].) CEQA does not contain specific provisions addressing how EIR's should analyze noise levels and impacts—its only references to noise involve impacts from projects related to airports and transportation. (§§ 21096, subd. (b), 21099; see Guidelines, §§ 15074, subd. (e) [airport land use plan], 15154 [projects near airports].)

The Guidelines also adopt a general approach to noise. The Guidelines use noise as an example of a direct physical change in the environment caused by a project. (Guidelines, § 15064, subd. (d)(1).) They also define a significant effect on the environment as a substantial, or potentially substantial, adverse change in ambient noise within the area affected by the project. (Guidelines, § 15382.)

Appendix G in the Guidelines is an environmental checklist used to evaluate project impacts. It contains questions about a number of topics such as aesthetics, agriculture resources, air quality, biological resources, hydrology and water quality, noise, recreation, and traffic. Two of the questions about noise ask if the project would result in (1) exposure of persons to noise levels in excess of standards established in the local general plan or noise ordinance, or applicable standards of other agencies and (2) a substantial permanent increase in ambient noise levels in the project vicinity above levels existing without the project. (Guidelines, appen. G, § XII(a) & (c).) The first question requires the lead agency to examine local land use planning documents and noise ordinances for specific noise standards.

### 2. *Land Use Plans, General and Specific*

Land use planning documents are a source of noise standards because the Legislature has required local governments to address noise in their general plans. (Gov. Code, § 65302 [required elements of a general plan].) The noise element shall (1) identify and appraise noise problems in the community; (2) analyze and quantify, to the extent practicable, current and projected noise levels from freeways, highways, major

7.

local streets, railroad operations, aircraft and airport operations, industrial plants and other stationary noise sources; (3) show noise contours for all these sources stated in terms of community noise equivalent level (CNEL) or day-night average sound level ($L_{dn}$);[3] and (4) include implementation measures that address existing and foreseeable noise problems. (*Id.,* subd. (f).) Specific plans may, but are not required to, address noise. (Gov. Code, §§ 65451, 65452.)

CEQA cases addressing the noise impacts of a proposed project often include references to the noise element in the applicable local land use plan. (See *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 205 [decibel standards in noise element of general plan and in city's noise ordinance].) In *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, we referred to the noise element in the Madera County General Plan and its 60 dBA $L_{dn}$ as the maximum acceptable noise level for residential uses affected by transportation noise. (*Id.* at p. 1123.) We concluded that the EIR's analysis of cumulative noise impacts was inadequate because the EIR did not address whether a 2.1 dBA addition to existing noise levels, which already were in excess of the maximum acceptable noise level, would be significant. (*Ibid.*)

## II.    TRAFFIC NOISE BASELINE

The first of plaintiff's three claims of error contends the revised EIR's analysis of cumulative noise impacts is legally defective because the baseline for off-site traffic noise substantially understated the actual amount of roadway noise. Plaintiff argues the understatement occurred because noise measurements for residential lots were taken next to the buildings and not taken in the front yards or at the property lines.

---

[3]     "The noise contours shall be prepared on the basis of noise monitoring or following generally accepted noise modeling techniques for the various sources …." (Gov. Code, § 65302, subd. (f)(2).) "The noise contours shall be used as a guide for establishing a pattern of land uses in the land use element that minimizes the exposure of community residents to excessive noise." (*Id.*, subd. (f)(3).)

A.      Revised EIR's Approach

The revised draft EIR contained a section addressing operational off-site traffic noise. That section's description of the environmental setting[4] included seven paragraphs under the heading "Traffic Noise Analysis Methodology." (Boldface omitted.) After stating that estimates of traffic noise levels could be based on mathematical models, measurements, or both, the revised draft EIR stated that City had elected to acquire actual measurements. It also stated: "Existing ambient daytime noise levels were measured at representative residential receptor locations along the study area roadway segments." Next, it described the equipment and methodology used to obtain noise measurements.

The "representative residential receptor locations" were nine roadway segments in residential areas. The revised draft EIR's description of those locations included the street address and where the sound meter was placed on each property. For instance, at Tucker Road south of Valley Boulevard, "[n]oise levels were measured within the front landscaping of the apartment complex at a distance of approximately 66 feet from the centerline of Tucker Road," which was the approximate distance between the road's centerline and the nearest unit. For a residential property on Red Apple Avenue west of Tucker Road, the revised draft EIR stated noise levels were measured within the driveway of the home and also stated:

> "This home is located approximately 67 feet from the centerline of Red
> Apple Avenue and is the closest home along this roadway segment to the
> roadway centerline. The sound level meter was set up at roughly the same
> distance to the roadway as the residential structure. The primary source of
> noise at this location was traffic on Red Apple Avenue. A total of 172

---

[4]      Normally, the environmental setting (i.e., the physical environmental conditions existing in the vicinity of the project when the notice of preparation or environmental analysis is commenced) constitutes "the baseline physical conditions by which a lead agency determines whether an impact is significant." (Guidelines, § 15125, subd. (a).)

vehicles drove along this roadway segment during the 20-minute noise level measurement period."[5]

In contrast to the place where the readings were taken on the foregoing properties, the noise measurements at a residence on Tucker Road north of Tehachapi Boulevard were taken "to the immediate east of the property fence at a distance of approximately 143 feet from the centerline of Tucker Road." At another location, noise levels were measured within the public right-of-way immediately in front of the home. Thus, some measurements were taken near the residential buildings and some were taken closer to the roadway.[6] The average daily noise levels for the roadway segments were presented in Table IV.I-2 of the revised draft EIR and used as the baseline noise levels.

B.    Noise Element in an Applicable Land Use Plan

The revised draft EIR describes the federal, state and local regulatory framework applicable to noise. One component of local noise regulation applicable to the project site is contained in the County of Kern's Greater Tehachapi Area Specific and Community Plan adopted November 2010 (GTA Plan). The GTA Plan includes a noise element with goals and policies. The policy relevant to this appeal provides:

> "Policy NOI.2:  Use good land use planning principles to reduce conflicts related to noise emissions and require noise compatibility between existing and future development according to the County's noise standards. Effective mitigation measures will be incorporated into project design if required.  Mitigation shall be designed to reduce noise levels to the

---

[5]    Plaintiff's expert asserted that "the Street View function of Google Maps clearly shows a picnic table in the front of this residence at a distance of approximately 50' from the roadway. It is inappropriate for environmental analysts to make assumptions about where and in what manner people enjoy their own property. This is, we believe, a primary reason why the vast majority of noise regulations apply unambiguously at the property line."

[6]    Plaintiff does not challenge all the measurement locations. It argues that "there is no factual dispute that four of the nine locations sampled did in fact contain outdoor activity areas located in front yards, closer to the roadway noise sources than the building facades."

County's required levels of 65 dBA $L_{dn}$ in *outdoor activity areas* and 45 dBA $L_{dn}$ or less within interior living spaces or other noise-sensitive interior spaces. The Plan does not adopt a standard for land uses that are not noise-sensitive."**7** (Italics added.)

Plaintiff's claim of error relates to the interpretation and application of the policy's phrase "outdoor activity areas."

C.    Contentions of the Parties

Plaintiff's comments to the revised draft EIR set forth its argument about the proper location for noise measurements. Plaintiff asserted that noise should be measured at the residential property line rather than building facades because the intent of the exterior noise standards—particularly the GTA Plan's standard for "outdoor activity areas"—was to protect outdoor uses, not just conversations and activity next to the building. In plaintiff's view, City's choice of measurement locations caused an underreporting of existing noise levels in outdoor activity areas, which resulted in an underreporting of noise impacts.

City disagreed with plaintiff's comment as to the correct place for taking noise measurements and responded in the revised final EIR as follows:

> "Outdoor activity areas are normally located near or adjacent to the main residential building and are areas where people expect to congregate for conversation. Outdoor activity areas for single-family residential uses are typically represented by back yards or the building setback. Outdoor activity areas for multi-family uses are typically private patios greater than 6 feet in depth and common areas for congregating. The property line of residential properties adjacent to roadways is not considered to be an outdoor living environment. For the most part, the locations that were selected for measurement are representative of the nearest outdoor living environment of the uses along the study area roadways. There were a few instances where the EIR consultant was not able to access a residential property for measurement."

---

**7**    The revised EIR describes noise levels using CNEL or day-night average levels (stated in decibels), which is how noise contours in the noise element of general plan are stated. (Gov. Code, § 65302, subd. (f)(2).) (See fn. 3 and accompanying text, *ante*.)

Plaintiff does not dispute the accuracy of the data collected and reported in the revised draft EIR, but "challenges the data's legal relevance as environmental baseline information. Noise levels measured at locations farther [a]way from the noise source than the impacted outdoor activity areas simply do not—and cannot—accurately represent pre-Project noise levels in these same activity areas."

D.      Choice of Methodologies

The dispute over the locations used for taking noise measurements could be viewed as a dispute over methodology. Appellate courts in California have held for over two decades that a lead agency's choice of methodology for studying an impact is subject to judicial review under the substantial evidence test. (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 654; *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198; *Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1620.) This general principle, however, is subject to an exception. The deferential substantial evidence test does not apply when the agency has applied an erroneous legal standard in making its choice of methodologies. (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259; see § 21168.5 [abuse of discretion if "agency has not proceeded in a manner required by law"].)

In this case, plaintiff contends that City has misconstrued plaintiff's arguments relating to baseline noise measurements as a dispute over methodology. We accept plaintiff's assertion that it is not challenging the methodology used by City to establish a baseline and analyze the project's noise impacts. A litigant controls the nature of the arguments its presents and we will not construe plaintiff's argument to be something that it has explicitly renounced.

12.

E.     Identification of Outdoor Activity Areas Is a Question of Fact

Plaintiff's reply brief states that it "argues only that baseline information should have been presented for the actual outdoor activity areas most likely to be affected by roadway noise generated by this Project." Plaintiff contends the property line is the most conservative location and its noise expert, Derek Watry, explained that "most local noise regulations generally do apply at the property line in order to ensure that all outdoor activity areas are protected." Based on these contentions, plaintiff concludes that "City's choice to depart from this norm in the current case was materially prejudicial," as shown by Watry's analysis of an outdoor activity area located 99 feet from the road where City's measurement was taken 116 feet from the road.

Our analysis of the proper identification of "outdoor activity areas" as that phrase is used in the noise element of the GTA Plan begins with the fundamental question of whether the determination of what constitutes an outdoor activity area is a question of law or a question of fact. We conclude it is a question of fact. As such, City's identification of the outdoor activity areas is subject to review under the deferential substantial evidence test. (See *Vineyard Area Citizens*, *supra*, 40 Cal.4th at p. 426 [claim that an agency committed factual error is reviewed under the substantial evidence standard]; § 21168.5 [abuse of discretion occurs if the agency's determination is not supported by substantial evidence].)

The first reason for concluding that the identification of an outdoor activity area for purposes of defining an environmental baseline presents a factual question is the lack of a definition in the GTA Plan. For example, the GTA Plan does not state that an "outdoor activity area" is (1) all ground within a residential lot's boundaries that is not occupied by a building or (2) where the residents gather for more than a specified number of hours over the course of a week, month or year. Furthermore, we have located, and plaintiff has cited, no law, regulation, ordinance or other planning document that defines the phrase. Consequently, plaintiff has not convinced this court that the identification of

13.

an outdoor activity area is a question of law that can be resolved by the mechanical application of a clear cut legal definition, such as a definition stating that an activity area begins at the property line.

The second reason for concluding that the identification of an outdoor activity area presents a factual question is revealed in the wording of plaintiff's argument. Plaintiff refers to what "most local noise regulations generally do" and "this norm." The words "most," "generally" and "norm" do not demonstrate that a legal standard is being applied to determine where to measure the noise experienced by an outdoor activity area. Under CEQA, an agency commits legal error when it "has not proceeded in a manner required by law." (§ 21168.5.) Plaintiff has cited no authority for the principle that City was "required by law" to do what *most* local noise ordinances *generally* do or that a "norm" is a "law" for purposes of section 21168.5. Consequently, we reject plaintiff's argument that City committed a legal error in choosing where to take the noise measurements on residential lots.

The third reason for concluding that the identification of an outdoor activity area presents a factual question relates to plaintiff's reliance on an expert. Plaintiff's expert Watry disagreed with the approach taken by Michael Brown of Cadence Environmental Consultants. This disagreement tends to show (but does not necessarily establish) that the controversy involves a question of fact rather than a question of law. Generally, CEQA regards the opinion of an expert supported by fact as "substantial evidence" for purposes of applying the substantial evidence test. In particular, section 21080, subdivision (e)(1) states that, for purposes of CEQA, "substantial evidence includes … expert opinion supported by fact." (See § 21082.2, subd. (c); Guidelines, § 15384, subd. (b) [definition of substantial evidence].) The factual nature of matters addressed by experts is reflected in Guidelines section 15151, which states: "Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts." Consequently, we conclude that each side's

14.

reliance on an expert provides additional support for our determination that the identification of an outdoor activity area is a question of fact.

F.    Substantial Evidence and Factual Error

Plaintiff's attempt to establish reversible error was based on "whether the baseline noise data obtained from these sampling locations provide a legally adequate description of the environmental baseline for purposes of CEQA." Plaintiff's contentions were not presented as a factual dispute. Accordingly, plaintiff did not develop the argument that City's choice of location for taking noise measurements was not supported by substantial evidence. Therefore, we need not describe in detail the evidence presented and explain why it constitutes substantial evidence supporting City's choice of locations for taking noise measurements.

III.    HOTELS: RESIDENTIAL OR COMMERCIAL LAND USE

A.    Contentions of the Parties

1.    *Plaintiff's Contentions*

Plaintiff contends the revised EIR (1) improperly evaluated the cumulative noise impacts to occupants of two hotels located along affected roadways and (2) erroneously concluded the project would cause no significant cumulative noise impact at those locations. Plaintiff argues that a hotel is a noise-sensitive use because people sleep there and, accordingly, City was required to apply the standards for residential noise levels to the two hotels in question. In plaintiff's view, "City's decision to classify the hotels as non-residential uses was prejudicial error" because it lead to the application of the more lenient noise standards for commercial uses and a determination of no significant environmental effect.

2.    *City's Contentions*

City contends plaintiff has not accurately described the EIR's analysis of the impacts of traffic noise at the hotels in question. City contends the EIR discussed

cumulative traffic noise impacts to the hotels from two perspectives. First, the EIR analyzed the noise impacts as though the hotels were a noise sensitive land use. Second and alternatively, the EIR analyzed the locations as though they were commercial areas not sensitive to noise. Under either scenario, the EIR concluded that the cumulative traffic noise impact would be less than significant. City also contends the alternate analysis of the hotels as commercial uses was appropriate because the question of noise sensitivity is a question of fact and a finding that the hotels were not noise sensitive is supported by substantial evidence.

B.      Discussion in the EIR

The EIR examined traffic noise at 13 off-site locations in the vicinity of the proposed Wal-Mart Supercenter. Four of the 13 roadway segments were in commercial areas, two of which included hotels. The roadway segments with a hotel were (1) Tehachapi Boulevard west of Mill Street and (2) Mulberry Street south of Tehachapi Boulevard. The EIR analyzed the *project's* noise impact at these and the other off-site locations and the *cumulative* noise impact at those locations of the project and reasonable foreseeable future projects.

The EIR's discussion of the project's impacts on traffic noise at the two road segments where the hotels were located stated:

> "Although Tehachapi Blvd., west of Mill Street, and Mulberrry Street south of Tehachapi Blvd., are commercial roadways, they each include *a hotel, which may be considered a noise-sensitive use because people sleep there*. As previously explained, train noise is the dominant noise source at these locations. Although baseline noise at both locations exceeds the standard for noise-sensitive uses, the incremental increase in total exterior noise caused by the project would be 0.1 dBA at the first location, and none at the second. Under the substantial/excessive criteria for noise-sensitive uses, the project's impact on Mulberry Street south of Tehachapi Blvd. would be nonexistent, and its impact on Tehachapi Blvd. west of Mill Street would result in an imperceptible increase in total acoustical energy, which would not cause persons to be exposed to excessive noise levels or represent a substantial increase in noise. Thus, if these roadways were analyzed as

noise-sensitive, the project's impact would be less than significant. *If they were analyzed as purely non-noise-sensitive uses, the applicable standard of 70 dBA would not be exceeded, even with the addition of the project, and neither would the applicable substantial/excessive criteria.* The project's impact on these roadways would thus be less than significant." (Italics added.)

Much of the foregoing discussion was repeated in the EIR's discussion of the *cumulative* impact of the project and 14 other projects on traffic noise:

"As previously explained, although Tehachapi Blvd. west of Mill Street, and Mulberrry Street south of Tehachapi Blvd. are commercial roadways, they each include a hotel, which may be considered a noise-sensitive use because people sleep there. Train noise is the dominant noise source at these locations. Although baseline noise at both locations exceeds the standard for noise-sensitive uses, the cumulative incremental increase in total noise would be 0.4 dBA at the first location and none at the second, which do not exceed the substantial/excessive criteria. Thus, if these roadways were analyzed as noise-sensitive, the cumulative traffic noise impact would be less than significant. If they were analyzed as purely non-noise-sensitive uses, neither the applicable standard of 70 dBA nor the substantial/excessive criteria applicable to non-noise-sensitive uses would be exceeded. The cumulative traffic noise impact on these roadways would thus be less than significant."

Earlier in the EIR, City identified thresholds of significance of cumulative traffic noise impacts based on whether the land was noise-sensitive or not sensitive to noise. For noise-sensitive land uses, the cumulative impact would be regarded as significant if (1) it pushed total traffic noise above the 65 dBA CNEL threshold or (2) the incremental increase in traffic noise caused by the cumulative projects would be substantial or excessive under a sliding scale criteria. Under that sliding scale, an increase of 1.5 dBA would be regarded as substantial or excessive if the baseline exterior noise was between 60 and 65 dBA. In comparison, the cumulative impact would be regarded as significant for land uses not sensitive to noise if it pushed the total traffic noise above the 70 dBA threshold or the combined increase in noise level was 5 dBA or more.

The final EIR included the public's comments to the revised draft EIR and City's responses to those comments. City's responses addressing traffic noise impacts treated

17.

the two road segments with hotels as commercial uses, rather than continuing to use the either-or approach of the revised draft EIR.

### C. No Explicit Legal Requirements for Classifying Hotels

Our first task is to identify any legal requirements that applied to City's analysis of the impacts of noise on the hotels. Those legal requirements are essential to deciding whether or not City has "proceeded in a manner required by law" for purposes of section 21168.5 when it analyzed the cumulative impact of traffic noise. (See *Vineyard Area Citizens*, *supra*, 40 Cal.4th at pp. 426-427; see generally, Code Civ. Proc., §§ 1896 [written laws defined], 1899 [unwritten law defined].)

Plaintiff has not identified any statute, regulation, published opinion, general plan, specific plan or zoning ordinance that explicitly required City to proceed with its evaluation of noise impacts by (1) classifying hotels as residences and (2) applying the standards for residential uses to the hotels.[8]

### D. General Requirement for an Internally Consistent Analysis

#### 1. General Principles

Plaintiff's claim of error seems to be based on the idea that CEQA requires an EIR's discussion of an environmental impact to be internally consistent. Guidelines section 15130, subdivision (b) requires an EIR's discussion of cumulative impacts to "be guided by the standards of practicality and reasonableness." We interpret this reasonableness standard to mean that a discussion of cumulative impacts should be internally consistent. Consequently, we consider whether the revised EIR has analyzed the noise impact at hotel locations in an internally inconsistent manner.

---

[8]    We note that state regulations addressing noise problems in communities surrounding airports treat residences as an incompatible land use within an airport's noise impact area, but do not list hotels or motels among the incompatible land uses. (Cal. Code Regs., tit. 21, § 5014; see Cal. Code Regs., tit. 21, §§ 5010 [purpose of regulations], 5012 [airport noise standard].) Thus, the state regulations provide an example of a law that treats residences and hotels differently for purposes of acceptable noise levels.

18.

## 2.  *Contentions Relating to the Proper Interpretation of the EIR*

Plaintiff interprets the revised EIR as an acknowledgement by City "that hotels are noise-sensitive land uses."  Based on this interpretation, plaintiff argues that the revised EIR's analysis of the noise impacts at the hotels "should have applied the more stringent criteria applicable to noise-sensitive land uses."

City disagrees with plaintiff's interpretation and contends the EIR's statement that a hotel "may be considered a noise-sensitive use because people sleep there" is not an admission or finding that hotels are noise-sensitive uses.  City argues plaintiff's interpretation is contradicted by the totality of the traffic noise analysis in the EIR, which discussed the roadway segments with hotels as commercial uses that were not sensitive to noise while also examining them as if they were noise-sensitive uses.  City contends the revised draft EIR's either-or approach was not internally inconsistent and actually provided the decisionmakers and the public with more information.

Plaintiff's reply brief addresses City's argument about the EIR's use of the word "may" instead of "are" in the statement that a hotel "may be considered a noise-sensitive use."  Plaintiff argues (1) City's interpretation of the word "may" is a disingenuous post hoc parsing of the EIR's language; (2) the EIR never stated that hotels were not noise-sensitive uses; and (3) any reasonable member of the public reading the EIR "would conclude that the City was treating hotels as noise-sensitive uses 'because people sleep there.'"  The logic underlying plaintiff's argument is that City found hotels were a noise-sensitive use and, therefore, was obligated by the need for internal consistency to apply the standards for noise-sensitive uses.

## 3.  *Interpreting the EIR*

We reject plaintiff's interpretation of the EIR's statement that a hotel "may be considered a noise-sensitive use."  We conclude this statement communicated the idea that City had not made a definitive finding that the hotels in question were noise-sensitive uses.

19.

First, the dictionary definition of the verb "may" is might or "be in some degree likely to." (Webster's 3d New Internat. Dict. (1993) p. 1396.) Thus, under its usual meaning, the word "may" is not the equivalent of "are." (See *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122 [courts may refer a word's dictionary definition to ascertain its ordinary, usual meaning].)

Second, the use of the word "considered" in the phrase "may be considered" further indicates that the question being discussed was not fully resolved and the EIR simply identified one possibility. A comparison of the phrases "hotels may be considered" and "hotels are" a noise-sensitive use illustrates that "may be considered" is an improbable choice for a drafter trying to inform readers that a definitive resolution of the question of noise sensitivity has been made.

Third, a basic rule of interpreting written documents is that words or provisions should be read in context, not in isolation. (E.g., *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865 [pleading must be interpreted as a whole and its parts in context]; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [contractual language must be interpreted in the context of the instrument as a whole]; *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 749 [words of statute must be construed in the context of the entire statutory scheme].) Here, the context for the phrase "may be considered a noise-sensitive use" is established later in the paragraph where the EIR analyzes the roadway segments with hotels as containing noise-sensitive uses and, alternatively, as containing "non-noise-sensitive uses." This discussion of alternatives demonstrates the EIR's drafters did not intend to make a definitive finding that hotels were a noise-sensitive use, but intended to address both possibilities. Consequently, we interpret the EIR as not determining, acknowledging or finding that the hotels in question were noise-sensitive uses. Instead, the EIR merely acknowledged that it was possible to consider them as such.

Plaintiff's argument that City failed to "proceed[] in a manner required by law" (§ 21168.5) in discussing the cumulative impact of traffic noise on the hotels was based on its interpretation of the revised draft EIR as finding that hotels were noise sensitive uses. Our rejection of that interpretation means the remainder of plaintiff's line of argument fails. Accordingly, we need not address its subsequent components.

IV. DETERMINING WHEN AN EFFECT IS CUMULATIVELY CONSIDERABLE

A. Overview of Cumulative Impact Analysis

1. *Two Fundamental Questions*

When a public agency is preparing the section of an EIR that addresses a particular cumulative impact, the contents of the EIR's discussion will be shaped by how the public agency answers two fundamental questions. The first question concerns the big picture—specifically, whether the cumulative impact is significant. The second question addresses a smaller picture—that is, whether "the project's incremental effect is cumulatively considerable." (Guidelines, § 15130, subd. (a); see § 21083, subd. (b).)[9]

2. *City's Determinations of Those Questions*

As to the first question, City determined that the cumulative noise impacts at eight residential locations were significant. The parties do not dispute this determination.

As to the second fundamental question, City determined that the project's incremental contribution to the cumulative noise impacts was not "cumulatively

---

[9] The statutory definition is rudimentary, stating that "'cumulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (§ 21083, subd. (b)(2).)

The regulatory definition is nearly identical: "'Cumulatively considerable' means that the incremental effects of an individual project are *significant* when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (Guidelines, § 15065, subd. (a)(3), italics added.) The word "significant" is italicized in this quote because it differs from the statute, which uses the word "considerable."

considerable" for purposes of CEQA. In plain English, City decided the project's incremental noise contribution to the larger noise impact was unimportant.

City's not-cumulatively-considerable decision had practical consequences affecting the contents of the revised EIR. First, the revised EIR was not required to include the more extensive discussion required when a project's incremental effect makes a cumulatively considerable contribution to a significant cumulative impact. (See Guidelines, § 15130, subd. (b)(1)-(5).) Second, the revised EIR was not required to discuss feasible mitigation measures that would reduce the project's incremental noise contribution or the cumulative noise impact. (Guidelines, § 15130, subd. (a)(3).)

Plaintiff contends City erred in determining that the project's incremental contribution to the significant cumulative noise impacts was not "cumulatively considerable"—that is, was not important enough to merit a detailed discussion and the consideration of mitigation measures. Plaintiff argues City used an erroneous test or standard to determine whether the project's incremental noise contribution was "considerable."

Our approach to plaintiff's claim of error is to describe the sequence of steps taken by City in its analysis of the noise impacts and to identify the rules of law that govern the steps where plaintiff contends an error was committed. Under this approach, an overview of the legal principles governing cumulative impacts is not provided. Instead, this unpublished opinion focuses on the rules of law that apply to the disputes raised by the parties.

B.    City's Discussion of Noise Impacts

The specific arguments presented by plaintiff refer to the thresholds of significance used by City to determine whether the project-specific noise impacts and cumulative impacts were significant. Consequently, our description of the steps taken by

22.

City in its analysis of the noise impacts begins with its adoption of thresholds of significance.

### 1. City's Initial Approach to Thresholds of Significance for Noise

The original EIR concluded that an increase in noise level of more than 5 dbA is readily noticeable and, therefore, is significant. It also concluded that an increase of less than 5 dBA is not significant. The trial court concluded this unrefined approach to thresholds of significance was legally inadequate and required the EIR to be revised.

### 2. Revised EIR's Approach to Thresholds of Significance

In response to the trial court's ruling, City adopted thresholds that analyzed smaller cumulative noise impacts and did not regard every increase under 5 dBA as less than significant. For noise-sensitive (e.g., residential) uses, the revised EIR adopted two separate tests for significance.

The first test was a relatively simple test. It considered whether the cumulative increase caused the threshold of 65 dBA to be exceeded. If the baseline noise level was below the threshold of 65 dBA, and adding the noise predicted to be generated by the project and 14 other projects caused the total predicted noise level to exceed 65 dBA, the cumulative increase was deemed to be a significant environmental impact. For example, the baseline noise level for the roadway segment of Tucker Road north of Conway Avenue was 63.6 dBA. The combined projects, including the Wal-Mart Supercenter, were predicted to increase the noise level to 65.4 dBA. This increase, which the revised EIR described as 1.9 dBA because of rounding, caused the 65 dBA threshold to be exceeded and, thus, was deemed a significant cumulative impact.

The second, more intricate test was designed to address increases that did not push the predicted future noise level above the 65 dBA threshold, either because the baseline noise level already was above the 65 dBA threshold or, alternatively, because the predicted future noise level was less than the 65 dBA threshold. The latter situation is

illustrated by the roadway segment at Curry Street south of Valley Boulevard, where the baseline noise level was 61.8 dBA and the predicted future noise level with all future projects was 64.4 dBA. The former situation is illustrated by the roadway segment at Valley Boulevard west of Curry Street, where the baseline noise level was 71.0 dBA and the predicted future noise level was 73.4 dBA. These increases, because of rounding, were described as 2.7 and 2.5, respectively, in the revised EIR and were deemed to be significant cumulative impacts.

The second test is more intricate because it has a stair-step structure derived from a sliding scale contained in the Federal Transit Administration's (FTA) 2006 manual entitled "Transit Noise and Vibration Impact Assessment." The fundamental idea underlying the FTA's sliding scale is that the higher the level of baseline noise, the smaller the noise increase needed to cause a significant impact. In other words, the significance determination reflects an inverse relationship between the baseline noise level and the noise increase. The revised EIR described the sliding scale in its text, depicted it graphically in Figure IV.I-2. The vertical axis of the graph indicated the noise exposure increase in a range from zero to 20 decibels. The horizontal axis of the graph indicated the existing noise exposure in a range from 40 to 80 decibels. The graph was divided into three regions by two curves. The upper region was labeled "Severe impact," the middle region was labeled "Moderate impact," and the lower region was labeled "No impact." For example, an increase in noise exposure of 15 to 20 decibels fell within the severe-impact region for all existing noise levels shown on the graph. In contrast, an increase in noise exposure of 5 decibels or less for existing noise levels of 40 to 50 decibels fell within the no-impact region. An increase of 5 decibels for an existing noise level of 60 decibels fell on the curve dividing moderate impacts from severe impacts.

City used the curve dividing the moderate-impact region from the no-impact region of the graph as the basis for its stair-step thresholds of significance for noise

24.

increases.  Those thresholds were applied to both project-specific and cumulative noise impacts and treated the following increases as substantial/excessive (i.e., significant):

> (1) 3 or more dBA when the baseline noise level was 56 dBA or more, but less than 60 dBA;

> (2) 2 or more dBA when the baseline noise level was 60 dBA or more, but less than 65 dBA;

> (3) 1.5 or more dBA when the baseline noise level was 65 dBA or more, but less than 72 dBA; and

> (4) an increase of 1.0 or more dBA when the baseline noise level was 72 dBA or more, but less than 75 dBA.

Additional steps were not needed because the baseline noise levels under consideration did not exceed 71.0 dBA.

Application of the foregoing thresholds of significance required City to determine a baseline noise level for each residential location under consideration—a process describe in part II of this opinion.  In addition, City was required to predict the increase in noise level that would occur at each location as a result of the project and as a result of the other present projects and reasonably foreseeable future projects.  Each prediction was then compared to the applicable threshold of significance to determine whether the project-level or cumulative increase was significant.

As previously noted, City answered the first fundamental question about cumulative noise impacts by determining that the predicted cumulative impacts at eight residential locations were significant, despite the project-specific increase at those locations being insignificant.

### 3. Revised EIR's Approach to Cumulatively Considerable

Based on the findings that there would be significant cumulative noise impacts, City was required to proceed to the second fundamental question and determine whether the project's incremental noise contribution to those impacts was "cumulatively

considerable." (§ 21083, subd. (b)(2); Guidelines, §§ 15130, 15355.) City's determination of this question involved three steps. First, it adopted a test for what constituted a cumulatively considerable incremental increase. Like the thresholds of significance, the test was inversely related to level of baseline noise. Thus, the higher the level of baseline noise, the smaller the incremental contribution needed to be deemed cumulatively considerable. Second, City compared (1) the noise level predicted by adding the noise generated by the project and all other present and reasonably foreseeable projects to the existing baseline to (2) the noise level predicted by adding the noise from the other projects to the existing baseline. This comparison showed how much of the cumulative impact could be attributed to the project's incremental contribution. Third, the test adopted in the first test was applied to the project's share of the cumulative impact determined by the second step. The test result determined whether the project's incremental contribution was "considerable" and, thus, triggered further disclosure requirements and the discussion of feasible mitigation measures. Under this method of analysis, the revised EIR concluded that the project's incremental noise effects at the eight residential locations were not cumulatively considerable.

> C.    Analysis of Plaintiff's Four Arguments

Plaintiff's reply brief asserts there are four elements in its challenge to City's determination that the project's incremental noise impacts were not important—that is, were not "cumulatively considerable" for purposes of CEQA. These elements all relate to the test City adopted for determining what constituted a cumulatively considerable incremental increase. Summarized in general terms, plaintiff contends City erroneously used the same "substantial increase" standard as the significance threshold for the project's individual impacts and as the test for whether its incremental contribution to a significant cumulative noise impact was considerable.

26.

### 1. *Application of the Same Thresholds as Sole Criteria*

Plaintiff's first specific argument asserts that the revised EIR "used the same FTA manual thresholds as the sole criteri[on] to determine both whether there [was] a significant Project-specific noise impact <u>and</u> whether the Project makes a considerable contribution to the acknowledge[d] significant cumulative impacts."

City argues that (1) the standards adopted were not the same and (2) it referred to the FTA methodology to *assist* its determination, not as the sole criterion for whether the incremental noise impacts were cumulatively considerable. City contends the standards were not the same because its stair-step approach to thresholds of significance was derived from the FTA's sliding scale, while the test it used for whether a contribution was cumulatively considerable "applied the FTA's noise impact criteria, without modification, to a new base consisting of baseline and cumulative traffic noise other than the noise caused by the project." In short, the two differences identified by City are a slightly different scale involving a smooth curve instead of stair-steps and a slightly different starting point (i.e., the existing baseline versus the existing baseline increased by the cumulative impact of the other projects without the Wal-Mart Supercenter).

City also rebuts the argument that the same standards were used by referring to a memorandum prepared by its noise expert, Michael Brown. Brown used the data for Tucker Road north of Conway Avenue to construct a hypothetical showing the standards were different. For that location, the applicable stair-step threshold of significance was a 2.0 dBA increase, because the baseline of 63.6 dBA fell between 60 and 65 dBA. Brown concluded that a contribution equating to 1.5 dBA was required to meet the standard adopted for a cumulatively considerable contribution, where the baseline plus the other projects equaled 64.7 dBA. Plaintiff disputed this point because its expert Watry contradicts Brown's analysis.

We conclude that Brown's calculations are an expert opinion supported by facts and, therefore, constitute substantial evidence for the conclusion that the standards were

27.

not the same. (Guidelines, § 15384, subd. (b) [definition of substantial evidence].) The disagreement between Brown and Watry, like disagreements among experts in general, does not make the EIR inadequate. (Guidelines, § 15151.)[10]

Based on our review of the revised final EIR and the Brown memorandum, we conclude that City did not use the same standard as (1) the threshold of significance and (2) the test for determining whether the project's incremental contribution to a significant cumulative impact was "cumulatively considerable." Both standards were based on the FTA methodology, but were not identical. There are two clear differences. First, the thresholds of significance were the only standards that were stair-stepped. Second, the starting number (baseline) for the calculations were not the same.

Furthermore, the response to comments contained in the revised final EIR states that the FTA's no-impact classification was used to *assist* the analysis of whether the project's effect was cumulatively considerable, thus implying that the FTA's classification was not the sole criterion considered. We accept the EIR's description of the reasoning process used even though the same results would have been reached if the FTA's classification was used as the exclusive criterion for determining whether a contribution was cumulatively considerable.

---

**10**     We also note that in comparing the two standards used in Brown's hypothetical, it appears City would have concluded an incremental contribution to a significant cumulative impact of 2.0 dBA was "cumulatively considerable" only if it contributed 75 percent or more to that cumulative impact. Brown's memorandum stated: "Using a percentage methodology to determine a considerable contribution to a significant cumulative impact such as the one discussed by the commenter is difficult because people could argue about what the threshold percentage should be." This shallow observation provides no useful information to the reader because the act of establishing any threshold or standard involves line-drawing and people could argue about where the line should be drawn even when it is not based on a percentage. Thus, the observation about the possibility of argument is not a rational basis for distinguishing a percentage test from other types of tests. More importantly, as shown by the first sentence in this footnote, a percentage can be calculated once the data from another type of test is available. Here, a percentage is inherent in the standards adopted by City.

Therefore, we conclude that plaintiff has failed to demonstrate that the same standards were, in fact, used for the two inquiries. As a result of this failure, we reject the first element or argument of plaintiff's claim that City erred in its analysis of whether the project's incremental effect was cumulatively considerable.

### 2. Analysis of a Cumulatively Considerable Effect—Reasonableness

As its second argument, plaintiff contends that the use of the same FTA standards for adopting thresholds of significance and determining whether the project's incremental noise impacts were cumulatively considerable rendered the analysis redundant and essentially meaningless. City urges us to construe this argument literally and conclude it fails because its factual foundation that the same standards were used is not accurate. We will not strictly construe plaintiff's argument that the "cumulatively considerable" analysis performed was essentially meaningless. Instead, we interpret the argument that the analysis was essentially meaningless as inherently including the position that the revised EIR's analysis was unreasonable.

This reasonableness standard is based on the following interpretation of Guidelines section 15130. Subdivision (b) of Guidelines section 15130 identifies the "elements … necessary to an adequate discussion of significant cumulative impacts." Those necessary elements do not address the point at which a project's individually minor contribution to a significant cumulative impact becomes cumulatively considerable. (Guidelines, § 15130, subd. (b)(1)-(5).) However, the last element requires "[a] reasonable analysis of the cumulative impacts of the relevant projects." (Guidelines, § 15130, subd. (b)(5).) This reference to a reasonable analysis reiterates the language in the lead-in to the element that states: "The discussion should be guided by standards of practicality and reasonableness." (Guidelines, § 15130, subd. (b).) We construe these provisions to mean that the EIR must contain a reasonable analysis of whether the project's incremental effect is cumulatively considerable. Consequently, the EIR's brief

description of the "basis for concluding that the incremental effect is not cumulatively considerable" must be reasonable. (Guidelines, § 15130, subd. (a).) If the basis for the conclusion is unreasonable, the agency has violated the Guidelines and, thus, "has not proceeded in a manner required by law" for purposes of the abuse of discretion standard set forth in section 21168.5.

Our conclusion that the reasonableness requirement from Guidelines section 15130 applies leads to the question of whether the reasonableness determination involves a question of fact or a question of law. This distinction is important for determining the applicable standard of review, because under CEQA claims of legal error are subject to independent review and claims of factual error are subject to the substantial evidence standard. (*Vineyard Area Citizens*, *supra*, 40 Cal.4th at pp. 426-427.)

As a general rule, California law regards the question of reasonableness as an issue of fact. For example, whether a party's conduct satisfies the standard of reasonable care applied in a negligence case is a question of fact, even though it sometimes is capable of being decided as a matter of law. (See *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 722-724 [summary judgment reversed because trial court erred in finding as a matter of law that defendant was not negligent].) The question of reasonableness also is a question of fact in other contexts. (*Wilson v. 21ˢᵗ Century Ins. Co.* (2007) 42 Cal.4th 713, 724 [insurance company entitled to summary judgment when it is undisputed that the basis for its denial of the insured's claim was reasonable]; *Pioneer Electronics (USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 370 [invasion of a reasonable expectation of privacy is a mixed question of law and fact that may be resolved as a matter of law when the material facts are undisputed]; *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 637 [in fraud case, the reasonableness of plaintiff's reliance is a question of fact for the jury, but may be decided as a matter of law where the facts permit reasonable minds to come to just one conclusion]; *Conte v. Wyeth, Inc.* (2008) 168 Cal.App.4th 89 [whether a consequence is reasonably foreseeable is a question of fact for jury that may

30.

be decided as a matter of law when there is no room for a reasonable difference of opinion].)

Accordingly, we conclude that the question of reasonableness presented by Guidelines section 15130 is a question of fact subject to review under the substantial evidence standard. Thus, the role of appellate courts in reviewing an agency's factual determinations under the substantial evidence standard is deferential and does not reweigh conflicting evidence to decide who has the better argument. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393.)

We conclude City's implied finding of fact that there was a reasonable basis for adopting the "cumulatively considerable" test described in the revised final EIR, even though other standards would have qualified as more reasonable. The reasonableness of City's "cumulatively considerable" test must be considered in context, rather than in an abstract, facial inquiry. In other words, the surrounding facts and circumstances will aid the finder of fact in deciding what is reasonable. Here, part of the relevant context is established by the fact that the cumulative impacts being analyzed were less than 3.0 dBA (the largest is 2.7 dBA), an increase in ambient noise that is not discernible to the average human ear. Another relevant fact is that the project's individual contribution to the noise level predicted at the eight locations, when analyzed by itself, was less than 1.0 dBA. In addition, the project's share of the cumulative noise impacts (the largest cumulative impact was 2.7 dBA) was never more than 0.7 dBA or, in percentage terms, 37 percent of the cumulative noise impact. In this extremely narrow context of noise impacts, City's reliance on the sliding scale to assist in determining whether the project's incremental effect was cumulatively considerable appears to be supported by substantial evidence. That evidence includes the FTA's manual and the opinion of City's expert, Brown, which is reflected in his testimony at a public hearing before the city council and his memorandum. (See § 21080, subd. (e)(1) [substantial evidence includes expert opinion supported by fact].)

31.

We readily acknowledge that plaintiff has presented logical arguments supporting its position that City used unreasonable standards to determine whether the project's incremental effects were cumulatively considerable. Furthermore, plaintiff's arguments are consistent with the legislative policies set forth in CEQA. (See §§ 21000, 21001, 21002, 21002.1, 21003.) For example, in this case a significant cumulative impact on noise levels was recognized, but no steps were taken to reduce or mitigate that impact. Consequently, one might conclude that City has failed to adhere to the policies of taking "all action necessary to provide the people of this state with … freedom from excessive noise" and ensuring "the long-term protection of the environment." (§ 21001, subds. (b), (d).) Similarly, one could conclude that City's approach contradicted the policy that a "public agency shall mitigate or avoid the significant effects on the environment of projects that it … approves whenever it is feasible to do so." (§ 21002.1, subd. (b).)

In particular, a standard that a project must contribute 1.5 dBA or more to a significant cumulative noise increase of 2.0 dBA before City regards that contribution as "cumulatively considerable" for purposes of CEQA, would allow individually insignificant noise impacts to quickly accumulate and produce a significant cumulative noise impact without any evaluation of mitigation measures or a finding of overriding considerations. In situations where the increases are detectible to the human ear, such treatment of a 75 percent contribution to a significant cumulative impact might hinder rather than promote CEQA's attempts to have significant cumulative effects addressed before they adversely impact the environment.

However, our review is limited to the narrow facts presented in this case, which involve cumulative noise impacts less than 2.7 dBA. Furthermore, we are constrained by the legislative directive that CEQA and the Guidelines shall not be interpreted in a manner that imposes substantive requirements beyond those explicitly stated in the statute or regulations. (§ 21083.1, added by Stats. 1993, ch. 1070, § 2, p. 5917; see *Leavitt v. County of Madera* (2004) 123 Cal.App.4th 1502, 1515 [a literal, i.e., explicit,

32.

approach to statutory construction is mandatory under CEQA].) Under this directive, we cannot create a general rule of law that requires a project's incremental contribution to a significant cumulative impact of a particular percentage—such as 20 percent, 33 percent or 51 percent—to be regarded as "cumulatively considerable" simply because doing so would appear to serve the general policies identified in CEQA. Therefore, we treat the reasonableness of City's approach as a question of fact and further conclude that it cannot be resolved as a matter of law on the present record.

In summary, we conclude that (1) the revised final EIR has adequately described the standard used to determine whether the project's incremental effect was cumulatively considerable and (2) the reasonableness of that standard is supported by substantial evidence, despite there being conflicting evidence that supports a contrary finding.

### 3. *Individually Minor Impact May Be Cumulatively Considerable*

As its third argument, plaintiff contends that the standard used to determine whether the project's incremental effect was cumulatively considerable violated CEQA because it failed to recognize that an individually minor increase may be a considerable contribution to an impact caused by many separate projects.

Plaintiff's contention is based on the language adopted in Guidelines section 15355, subdivision (b) to define cumulative impacts. The last sentence of that subdivision states: "Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time."[11] This statement helps explain the concept of a cumulative impact, but provides little help in distinguishing whether an individually minor impact is or is not "cumulatively

---

[11] This sentence is not reasonably susceptible to being interpreted to mean that all individually minor impacts are cumulatively considerable. As a background, we note that the sentence appears nearly verbatim in the federal regulation's definition of cumulative impacts. (See 40 C.F.R. § 1508.7.) The only difference is that the federal regulation used the phrase "collectively significant actions" instead of "collectively significant projects."

33.

considerable" for purposes of subdivision (b) of section 21083 and Guidelines section 15130. Consequently, plaintiff has not shown that City committed legal error in its adoption of a standard for determining when an individually minor (i.e., insignificant) incremental effect was cumulatively considerable for purposes of CEQA.

This argument appears to be a reiteration of plaintiff's first argument about the inappropriate use of the same standards for determining significance and whether a project's incremental effect was cumulatively significant. For instance, plaintiff's reply brief contends that "use of the same threshold to determine project-specific noise impacts and to evaluate cumulative noise impacts is improper because it fails to recognize that 'individually minor' impacts may nonetheless constitute a considerable contribution as they add up." As discussed in part IV.C.1, *ante*, the standards were not the same and, consequently, that part of plaintiff's argument failed.

### 4. *Substantial Evidence to Support the Standard*

As its fourth argument, plaintiff contends that (1) the revised EIR did not justify its considerable contributions thresholds with substantial evidence and (2) the revised final EIR did not adequately respond to comments challenging those thresholds.

Earlier we concluded that (1) the revised final EIR adequately described the standard used to determine whether the project's incremental effects were cumulatively considerable and (2) the reasonableness of that standard was supported by substantial evidence. That evidence included the testimony and memorandum of Brown, the City's expert who analyzed noise impacts, and the FTA's manual. Thus, we reject plaintiff's argument that the revised EIR did not justify its considerable contributions thresholds with substantial evidence.

Furthermore, we conclude the response to comment No. 4-13 set forth in the revised final EIR adequately explained the basis on which City chose the standards used to determine whether the project's incremental effects were cumulatively considerable.

34.

The response also explained how those standards were different from the thresholds of significance.  Plaintiff's contention that the response in the revised final EIR "does not justify using the same thresholds" is flawed because the same thresholds were not used.  Accordingly, we reject the claim that the responses were inadequate.

## DISPOSITION

The order discharging the writ of mandate is affirmed.  City shall recover its costs on appeal.

_____
FRANSON, J.

WE CONCUR:


_____
DETJEN, Acting P.J.


_____
SMITH, J.